UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| VIRGINIA G. ROBINSON | CIVIL ACTION NO. 08-333 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| BOSSIER PARISH SHERIFF, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before this Court is Defendant Steven Braidwood's ("Braidwood") *Motion for Summary Judgment* [Record Document 55] and a *Motion for Summary Judgment* [Record Document 58] filed by Defendants Chad Gauthier, Pat Beaseley, Sheriff of Bossier Parish, William Kevin Coleman, and Thomas Rucker. For the reasons which follow, summary judgment as to all of the Plaintiff's claims is GRANTED and the claims are DISMISSED with prejudice.

**I. BACKGROUND**

This lawsuit arises out of the tragic death of Leroy Spates ("Spates"), an inmate at the Bossier Parish Sheriff's Office's minimum security facility. Spates died on March 13, 2007, from either a tumor that began to bleed or a sudden bleed in his brain. Spates had a long history of cocaine abuse and was a diagnosed and medicated paranoid schizophrenic. At the time of his death, Spates was in pre-trial detention having been arrested almost a month earlier.

Plaintiff presents one witness, Spates's bunk mate Donald Blackshire ("Blackshire"), who asserts that Spates began vomiting on March 10, 2007 and was not given medical attention despite Blackshire's request. Blackshire allegedly told Deputy Coleman on March

11, 2007, that Spates was ill and needed to see a doctor and Coleman refused his request. According to his testimony, Spates had vomited blood all over the wall, bed, and trash can in their dorm.

On March 13, 2007, Spates vomited at breakfast and was taken to holding tank three to await the arrival of the EMT on duty, Defendant Braidwood. Braidwood arrived after eight a.m. and at that time, after giving Spates medication for nausea, released him back to his dorm. There is testimony that Spates was alert during this time and was requesting to return to the dorm at least two hours before Braidwood examined him. Despite his eagerness to return to the dorm, Spates's dorm mates soon called for the EMT to come back and take Spates back to the holding cell. When Braidwood, Deputy Beaseley, and Deputy Gauthier transported Spates to the holding cell, he was weak and needed to be assisted. Once in the cell, Spates sat on the bunk, drank some of his juice, and was served lunch. After lunch, Spates was observed lying naked on the floor of holding room three. The Defendants argue he had defecated and urinated on himself. Plaintiffs argue he was just nude. Braidwood and Rucker allegedly ordered that ice cold water be thrown on him to either evoke a response or clean him up.

At approximately 2 p.m., about an hour after the alleged ice water incident, Spates was cleaned up, and carried naked to holding cell four. There is some dispute as to whether he was actively resisting at this time. He was covered with a gown, but lay on the floor. At least three different individuals saw him either sitting on the bed, lying on the floor making intentional movements, or standing between 2 and 4 p.m. Braidwood checked on Spates at least twice during this time. At 4 p.m. he was observed by Braidwood to be lying on the floor and was assumed to be sleeping. Braidwood left the facility a little after 4 p.m.

without leaving any instructions for Spates's care with the Deputies. At approximately 4:25 p.m. an ambulance was called by Deputy Beaseley based on his conversations with the nurse at the near by maximum security facility and observations that Spates's condition had changed. Spates died two days later in the hospital.

There is dispute between the experts in this case about the cause of Spates's death. Defendants' medical expert argues Spates died due to a sudden hemorrhage into the brain with massive edema. Plaintiffs argue his death resulted from a bleeding tumor that had existed undetected for some time and had perhaps caused the schizophrenic behavior. The Plaintiff's expert also stated that there was no way that he could tell how fast the particular bleed occurred but that it was possible that it began the day that Spates was taken to the emergency room. While arrival at the hospital earlier may have increased Spates's chances, Plaintiff's expert also notes that "if he was taken the same day [that his symptom's appeared] then I couldn't argue with the promptness of care." And when asked if Spates should have been taken to the hospital more quickly if Spates was exhibiting symptoms of headaches, vomiting and dizziness for a couple of days, the Plaintiff's expert stated "[I]t's hard to say given his schizophrenia." Defendant's expert has stated that the sudden hemorrhage could not have been prevented absent advance detection and that taking him to the hospital earlier would not have prevented Spates's death.

Plaintiff alleges that Defendants individually and as a group were deliberately indifferent to the serious medical needs of Spates in violation of the Eighth Amendment of the United States Constitution. Plaintiff further argues that Chief Rucker was deliberately indifferent in his failure to supervise the other Deputies and give them adequate training in how to deal with ill patients. Plaintiff also brings a <u>Monell</u> claim against the Bossier

Parish Sheriff. Finally, Plaintiff claims damages under state law breaches of duty.

## II. LAW AND ANALYSIS

"Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." Swanson v. Hearst Corp. Long Term Disability Plan, 586 F.3d 1016, 1018 (5th Cir. 2009) (citing Fed.R.Civ.P. 5(c)). "We resolve doubts in favor of the nonmoving party and make all reasonable inferences in favor of that party." Dean v. City of Shreveport, 438 F.3d 448, 454 (5th Cir. 2006). No genuine issue of material fact exists if the evidence is such that no reasonable juror could find for the nonmovant. Wheeler v. BL Dev. Corp., 415 F.3d 399, 402 (5th Cir. 2005). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

### A. Qualified Immunity Standard

Qualified immunity protects government officials from personal civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pasco v. Knoblauch, 566 F3d 572 (5th Cir. 2009). More precisely "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The qualified immunity shield is broad and protects actions, even mistakes, that are

reasonable under the existing law. See Fraire v. City of Arlington, 957 F.2d 1268 (5th Cir. 1992). Once the government official pleads qualified immunity as an affirmative defense, the burden then shifts to the plaintiff. Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff has the burden of establishing a violation of a clearly established right and that the government official's conduct was objectively unreasonable in light of the clearly established law at the time of the violations. Id.

**B. Eighth Amendment Deliberate Indifference Claim**

The Eighth Amendment's "cruel and unusual punishment" clause has been interpreted to require the provision of medical care to prisoners. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999) (citing Farmer v. Brennan, 511 U.S. 825 (1994)). Therefore, deliberate indifference to the serious medical needs of an inmate violates the Constitution's ban against cruel and unusual punishment under the Eighth Amendment. A medical need is serious if treatment has been recommended or where the need is so apparent that "even a layman would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345, n. 12-13 (5th Cir. 2006). It also includes the "unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976). Finding a violation of the Eighth Amendment in the institutional setting requires showing "objective exposure to a substantial risk of serious harm . . . [and] that prison officials acted or failed to act with deliberate indifference to that risk." Gobert, 463 F.3d at 345-46.

> A prison official acts with deliberate indifference only if he knows that inmates face a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it. Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment. A showing of deliberate indifference requires the prisoner

> to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is a very high standard to meet.

Id. at 346 (internal quotation marks, citations, and footnotes omitted). An inmate does not need to show that he was injured by the actions of the official but only that the actions posed a serious health risk. Gates v. Cook, 376 F.3d 323, 341 (5th Cir. 2004) (holding that an Eighth Amendment plaintiff did not have to prove he was actually injured by exposure to raw sewage, only that such exposure posed a serious health risk). Furthermore "deliberate indifference exists wholly independent of an optimal standard of care." Gobert, 463 F.3d at 349. Even considering and failing to follow the recommendations of another treating physician does not amount to deliberate indifference. Stewart, 174 F.3d at 535. Failure to receive the most effective treatment also cannot form the basis of deliberate indifference, but rather sounds in negligence. Gobert, 463 F.3d at 350. "Continuous personal treatment by the defendant physician is not constitutionally mandated." Id. at 351 (citing Stewart, 174 F.3d at 535).

Defendant has brought Eighth Amendment claims against Defendants Braidwood, Gauthier, Beaseley, Coleman, and Rucker.

**I. Defendant Steven Braidwood**

EMT Braidwood is at the center of Plaintiff's claims. There is no evidence Braidwood was aware that Spates was ill prior to March 13, 2007. That morning, when Braidwood arrived, he found Spates in the holding tank. Spates had vomited during breakfast and had been placed in the holding tank pending his arrival. After Braidwood examined him, and Spates indicated he wished to return to the dorm, Spates was given medication for nausea and returned to the dormitory. A little while later, Braidwood was

called to examine Spates who was complaining of nausea and was shaking. Braidwood transported, with the help of Gauthier and Beaseley, Spates back to holding tank three. Sometime after lunch, Braidwood observed Spates on the floor of the tank. Plaintiff alleges Spates was unresponsive and that Braidwood, in cooperation with Ruckers, threw a bucket of ice water on him to elicit a response. Braidwood then carried Spates to holding tank four where Spates was observed by at least three people to be alert and making voluntary movements until around 3:30 after which time he appeared to be asleep. It was only after Braidwood left the prison that Gauthier saw a change in Spate's behavior which prompted the 911 call. Additionally, Deputy Carter also saw Spates get off the bunk in his holding cell around the time that Braidwood left and it was only then that he felt that additional assistance should be called for.

There is much dispute about the standard of care and whether Braidwood should have known that the nausea and unusual actions warranted a trip to the emergency room. However, "deliberate indifference exists wholly independent of an optimal standard of care." Gobert, 463 F.3d at 349. Further, even the Plaintiff's own expert stated that taking a patient to the emergency room the same day that he exhibited Spate's symptoms was more than adequate and that he might have advised one of his own patients to take a couple of aspirin and call him in the morning with the same symptoms.

Tragically, Spate's mental illness made it difficult to determine if the unresponsiveness or strange behavior was physical or mental. Plaintiff argues that "any person should know to transport to a hospital if you are not obtaining a verbal response of some kind from a person who is not reacting to outside stimuli." Yet, such unresponsiveness was symptomatic of his condition. Even Spate's roommate has sworn

that in the three or four days that he lived as his bunkmate he never heard Spate speak and that Spates was often not responsive to verbal cues. Plaintiff also alleges that Braidwood should have taken additional action because Mr. Spates was "acting oddly and was confused and disoriented." But Plaintiff also freely admits that "Mr. Spates had a mental health component that complicates his condition" and Plaintiff's proposed expert stated that it would be hard to determine what Braidwood should have done in the circumstances given Spates's schizophrenia.

Plaintiff insists that Braidwood was uncaring, he "forgot" Spates, and that he did not treat Spates as an ordinarily prudent physician would. Braidwood by all accounts, however, checked on Spates several times during the day, prescribed him medication, and allowed him to rest in the holding tank. Additionally, the change in behavior which prompted the 911 call appears from the evidence to have occurred after Braidwood left the premises. Braidwood's actions do not rise to the level of deliberate indifference that warrants a constitutional violation. Plaintiff admits that the testimony of the officers - the only evidence on this point - shows that Spates was in "decent neurological condition" until 4:05 pm. There is no indication that Braidwood knew that Spates was on the verge of hemorrhaging or had a tumor. His failure to call 911 may have been negligent in the eyes of some, but was certainly not such an action that rises to the level of deliberate indifference. Plaintiff has failed to show that Braidwood was subjectively aware Spates was facing a substantial risk of serious bodily harm and failed to take reasonable measures to abate it. The evidence instead shows that Spates was given more than mere rudimentary care and that even a neurologist would have had difficulty diagnosing Spates's symptoms as something more than a side effect of his mental illness or simple nausea.

Thus, even the opinion of Plaintiff's expert supports the Court's conclusion that the Defendants were not deliberately indifferent to Spates's medical needs.

There is then left Braidwood's choice to pour ice cold water on a sick inmate. There is no doubt that such an action, if it occurred as alleged, may be viewed as callous and unfeeling, but being callous or rude in the context of medical care does not an Eighth Amendment violation make. There is no indication that Braidwood's actions contributed to Spate's illness or placed him in a dangerous situation. While Plaintiff does not have to show that Spates was injured by the actions, but only that he was exposed to a serious health risk, Plaintiff cannot even meet that lower standard. Spates was moved from his cell soon after the alleged incident and was dry and at least covered when he was taken to the hospital. There is no indication that pouring ice water on a patient is likely to produce more than discomfort. And discomfort does not rise to the level of a Constitutional violation. Braidwood was not deliberately indifferent to Spates's serious medical needs by pouring cold water on him as he lay on the floor.

Therefore, because Braidwood was not deliberately indifferent to Spate's serious medical needs, there is no Constitutional violation and Braidwood is entitled to qualified immunity.

**ii. Defendant Chad Gauthier**

Gauthier's challenged actions consist of (1) assisting Braidwood in transporting Spates to a holding tank for observation and (2) carrying Spates to a different holding tank after the alleged ice water incident. Plaintiff alleges that Gauthier was deliberately indifferent to Spates in contravention of the Eighth Amendment when he did not call 911 or procure additional medical care for Spates during that time.

If EMT Braidwood was not deliberately indifferent for failing to call 911 or procure additional medical care for Spates on March 13, then Gauthier was certainly not deliberately indifferent. There is no indication that Gauthier did anything but assist Braidwood. Further, at no time did Gauthier have occasion to individually assess Spates since Spates was under the care of Braidwood throughout his shift. Gauthier was entitled to rely on Braidwood's superior medical knowledge in assessing the situation. Further, Gauthier testified that he saw Spates acting voluntarily up until around an hour before 911 was called. Gauthier had no reason to believe that Spates had a serious medical issue or that the issues that he had were not being dealt with properly. Therefore, Gauthier is entitled to qualified immunity.

### iii. Defendant Pat Beaseley

Beaseley also was involved in carrying Spates, on EMT Braidwood's orders, to a holding tank on the morning of March 13, 2007. Beaseley later checked on Spates at about 4:05 pm when he found him lying on the floor and believed him to be sleeping. Beaseley called 911 twenty-five minutes later after he discussed Spates' behavior with the head nurse at the maximum correction facility. There is no evidence that he was aware that Spates was bleeding or had any symptoms of serious medical issues prior to the day of Spates' death.

Since Beaseley called 911 at the end of the day, Plaintiff's only argument can be that he was deliberately indifferent by not calling earlier in the day. Like Gauthier, Beaseley simply assisted Braidwood. He observed Spates acting in a voluntary manner, Braidwood checking on Spates periodically, and he was aware enough of Spates's behavior that he called the nurse at the maximum facility and then called 911 when it

changed.  Beaseley's actions in failing to call 911 earlier in the day did not rise to the level of deliberate indifference necessary to establish a Constitutional violation.  Therefore, he is entitled to qualified immunity.

### iv. Defendant W.K. Coleman

Coleman was not at work on the day that Spates died.  He is alleged to have been told and to have observed that Spates was ill during the days leading to his death and to have done nothing to assist or provide medical care for Spates. The sole evidence on this count is Spates' former bunk mate, Donald Blackshire ("Blackshire") who is unable to state clearly which day he asked Coleman "whether he could help this man."  Additionally, while Plaintiff speculates that Coleman saw the blood on the wall, Plaintiff is unable to produce proof or even testimony on that point beyond pure speculation.

If Spates's bunk mate's testimony is taken as fact, the most that can be proven is that Coleman did not immediately provide medical care for an unspecified problem with Spates.  It could be that Coleman believed that Blackshire was complaining of Spates's strange behavior due to his mental illness.  It is also possible that he never understood that Spates was any more than nauseated, a condition that even Plaintiff's expert noted would most often be dealt with by monitoring.  There is no indication that Coleman had subjective knowledge that Spates was at substantial risk of serious medical harm when he allegedly did not provide care.  It is certain that Spates was given care within forty-eight hours of the alleged complaint.  In these circumstances, a slight delay in treatment is not sufficient to support a claim for deliberate indifference.  Therefore, summary judgment is **GRANTED** as to all of Plaintiff's claims against Deputy Coleman who is entitled to qualified immunity.

**v. Defendant Chief Thomas Rucker**

There is no evidence that Defendant Rucker was aware that Spates was seriously ill, or exhibiting symptoms of a serious medical issue prior to March 13, 2007. Taking all the evidence in the light most favorable to the Plaintiff, Rucker observed Spates in holding tank three, instructed another inmate to retrieve a bucket of ice water, and then watched as Braidwood threw the water on Spates as he lay on the floor. It is disputed whether Spates was covered in his own excrement or whether he was simply lying on the floor still during this incident. Regardless, there is ample testimony that Spates was alert and making voluntary movements after this incident. In fact, there is no testimony that indicates that Spates was unconscious even during this incident but only that he was unresponsive - which he often was because of his illness. Plaintiff alleges that Rucker was deliberately indifferent because he knew that Braidwood was not treating Spates correctly and he did nothing to intervene or ensure that Spates received appropriate care.

Supervisory officials such as Chief Campbell cannot be held liable under Section 1983 for the actions of subordinates on any vicarious liability or respondeat superior liability theories. See Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005).[1] Further, there can be no supervisory liability where there is not an

---

[1]Plaintiff appears to also allege that Captain Rucker is liable because he failed to adequately train and supervise his deputies. Such an argument must be supported by evidence of a pattern of behavior or so reckless a hiring choice that it shows deliberate indifference to the constitutional rights of the prisoners. See North Richland Hills, 406 F.3d at 381; Roberts v. City of Shreveport, 397 F.3d 287 (5th Cir. 2005). In order to succeed, Plaintiff must show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." North Richland Hills, 406 F.3d at 381 This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. To meet the stringent standard of deliberate indifference under this theory, Plaintiff must prove not only a pattern of violations, but

underlying constitutional violation.  See Becerra v. Asher, 105 F.3d 1042, 1047-48 (5th Cir. 1997); Saenz v. Heldenfels Bros., Inc., 183 F.3d 389, 392-93 (5th Cir. 1999).  Here, the Court has ruled that Plaintiff has failed to establish an underlying Constitutional violation by one of the deputies or the EMT.  Thus, there can be no municipal or supervisory liability based on their actions.

    Rucker, therefore, must be liable for his own actions or his failure to intervene.  Spates was under the care of a medical professional more qualified than Rucker to determine the course of treatment but also Spates's condition.  Further, even Plaintiff's own expert could not say definitively that even a vomiting, dizzy, weak Spates should have been taken to the hospital earlier given his disease and the difficulty in differentiating the symptoms of schizophrenia and nausea from symptoms of a rare and more serious underlying condition. Rucker was entitled to depend on Braidwood to make the decisions and there is no evidence to suggest that Rucker knew or should have known that Spates had a serious medical need that was not being given adequate attention.  At worst he was

---

also that the inadequacy of the training was obvious and obviously likely to result in a constitutional violation.  See id.

    Plaintiffs have spent time arguing that the training or staffing of the prison with medical personnel was inadequate, but they have not shown deliberate indifference on the part of Chief Rucker.  This Court has scoured the record in this case and has found nothing in the record that even remotely suggests a prior pattern by any of the officers involved of violating constitutional rights by failing to take prisoners to the hospital in a timely fashion. Instead, this Court notes that another prisoner was taken to the hospital earlier in the day from the same prison where Spates was being treated.  Far from establishing a pattern, the evidence shows that Chief Rucker had many policies, procedures, and training methods in place to ensure that the rights of inmates to receive medical care were respected.  Further, even if the officers involved in the alleged violation had been systematically violating prisoner's rights to medical care, there is no notice that Chief Rucker had notice of that pattern.  Therefore, Plaintiffs cannot establish that any alleged failure to train on the part of Chief Rucker reflected a deliberate or conscious choice to endanger the rights of his prisoners or Spates specifically.

callous and unfeeling toward a mentally ill man that he reasonably believed to not be cooperating with medical personnel. Therefore, summary judgment as to all of Plaintiff's claims against Chief Rucker is hereby GRANTED.

**C. CLAIMS AGAINST BOSSIER PARISH SHERIFF**

Plaintiff here alleges that Defendant Bossier Parish Sheriff's actions deprived Spates of his constitutional rights by "faili[ng] to provide medical training, adequate personnel, facilities and policy to his deputies and EMTs." Plaintiff further asserts that the alleged acts of deliberate indifference "were caused by the sheriff's policy, practice, or procedure of failing to provide adequate personnel and training." Plaintiff here is suing the Bossier Parish Sheriff in his official capacity and as an entity; therefore, municipality liability rules apply. Cities and municipalities may be held liable for the acts of their employees or agents only if the injury inflicted results from the "execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy." Monell v. New York city Department of Social Services, 436 U.S. 658, 694 (1978). To establish liability under 42 U.S.C. § 1983, Plaintiff is required to prove: (1) a policy or custom existed, (2) the governmental policy makers actually or constructively knew of its existence, (3) a violation of constitutional rights, and (4) the custom or policy served as the "moving force" behind the violation. Meadowbriar Home for Children, Inc. v. G.B. Gunn, 81 F.3d 521, 532-33 (5th Cir. 1996). Importantly, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur . . . " Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (emphasis added).

Thus, Plaintiff must show an underlying violation of the Constitution. As previously

discussed, Plaintiff here is unable to meet this burden, as this Court has concluded that Spates's rights were not violated. As noted above, there can be no supervisory or municipal liability where there is not an underlying constitutional violation. See Asher, 105 F.3d at 1047-48; Heldenfels Bros., Inc., 183 F.3d at 392-93. Here, the Court has ruled that Plaintiff has failed to establish an underlying constitutional violation. Therefore, there can be no municipal or supervisory liability. Summary Judgment as to claims against the Bossier Parish Sheriff is therefore GRANTED.

**D. STATE LAW CLAIMS**

Plaintiff further claims that the "failure(s) by employees of the Bossier Parish Sheriff . . . constitute negligence and violated Louisiana Civil Code Article 2315, et seq., and the 1974 Louisiana Constitution." For State law claims of negligence raised by prisoners regarding their medical care, we use a standard of reasonableness in the circumstances. Cole v. Acadia Parish Sheriff's Dept., 998 So.2d 212, 216 (La.App. 3 Cir. 2008). Prison authorities must provide standards for medical care in their institution "including preventative, diagnostic, and therapeutic measures on both an outpatient and hospital basis." La.R.S. 15:831 (A). A prison is not required, however, to place a full hospital on every prison site in order to protect an inmate against every medical risk. Cole, 998 S.2d at 216 (citing Elsey v. Sheriff of Parish of East Baton Rouge, 435 So.2d 1104 (La.App. 1 Cir. 1983)). In order to succeed on a negligence claim Plaintiff must show Defendant had a duty, breached that duty, that the breach was the cause-in-fact as well as the legal cause of the plaintiff's injuries and that there were actual damages. See Mathieu v. Imperial Toy Corp., 646 So.2d 318, 322 (La. 1994); Mart v. Hill, 505 So.2d 1120, 1122 (La. 1987); Hill v. Lundin &Associates, Inc., 256 So.2d 620 (1972). Because we have found that the

officers were reasonable[2] in not calling 911 earlier in the day, summary judgment as to all claims based on a negligent failure to provide additional medical assistance is **GRANTED**.

This leaves only the choice by EMT Braidwood and Chief Rucker to throw ice water on Spates while he was lying on the ground. Even assuming *arguendo* that this was not reasonable in the circumstances, there is no evidence that the ice water contributed negatively to his overall health status, caused, or was a contributing cause to the illness or eventual death of Spates. Negligence requires causation. Mathieu, 646 So.2d at 322. Here, there is no competent summary judgment evidence that throwing ice water on Spates did any more than make him momentarily uncomfortable. Plaintiff is required to present more than a scintilla of evidence of causation. Here, there is simply insufficient evidence on the issue of causation. Therefore, summary judgment is **GRANTED**.

## III. CONCLUSION

For the foregoing reasons, this Court finds that these officers are entitled to qualified immunity from suit. Their alleged actions are not sufficient to support a constitutional violation. The record shows clearly that the Defendants monitored Spates, observed his behavior, made reasonable interpretations of his presenting symptoms and rendered reasonable medical care under the circumstances from the time he first began exhibiting symptoms of nausea to the time they sent him to the Emergency Room to the time of his death. Therefore, summary judgment is GRANTED and all claims of the Plaintiff against Defendants are DISMISSED with prejudice.

---

[2] Even if defendants had not been reasonable, there is no indication that earlier action would have prevented the defendant's death. Thus, their actions are not the cause in fact or legal cause of Spates's death.

A Judgment consistent with the terms of this Memorandum Ruling will issue forthwith.

Thus done and signed this 3rd day of February, 2010 in Shreveport, Louisiana.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE